JOSEPH C. ZIEGLER, JR.,

      Plaintiff,

    v.

ALLSTATE INSURANCE COMPANY,
ALLSTATE FINANCIAL SERVICES, LLC,
BILL MCGRATH,

      Defendants.

No. 16 CV 869

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Joseph Ziegler, Jr. is an African American man who sold insurance products as an independent exclusive agent for defendant Allstate Insurance Company. In 2015, the Allstate African American Agent Alliance held a meeting. Ziegler alleges that, as president of the Alliance, he refused to allow a white supervisor to attend the meeting, at which race-related complaints were discussed. Shortly after the meeting was held, Allstate terminated its contractual relationship with Ziegler, citing his use of an unlicensed employee to conduct insurance business. Ziegler brings a claim of racial discrimination, pursuant to 42 U.S.C. § 1981, and other state and federal claims against defendants Allstate, Allstate Financial Services, LLC, and Bill McGrath, a regional supervisor for Allstate. In return, Allstate brings counterclaims for breach of contract and misappropriation of trade secrets. Defendants move for summary judgment of all claims and

counterclaims. For the following reasons, the motion is granted in part, denied in part.

## I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To survive summary judgment, the nonmoving party must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 591 (7th Cir. 2016) (citation omitted). All facts and reasonable inferences are construed in the light most favorable to the nonmoving party. *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 879 F.3d 760, 766 (7th Cir. 2018).

## II. Facts

Allstate sells insurance products and services to individuals and businesses. [99] ¶ 8.[1] One way Allstate does this is through its Exclusive Agency Program, in

---

[1] Bracketed numbers refer to docket numbers on the district court docket. Page numbers are taken from the CM/ECF header at the top of filings, except in the case of citations to deposition and court transcripts, which use the transcript's original page number. Facts are largely taken from Ziegler's response to defendants' Local Rule 56.1 statement of undisputed material facts, [99], which contains both the defendants' factual assertions and Ziegler's responses. In many instances, Ziegler's response does not comply with LR 56.1.

which Allstate contracts with independent exclusive agents who develop business on its behalf. [99] ¶¶ 9, 13. The relationship between Allstate and its exclusive agents is defined by the Allstate R3001S Exclusive Agent Agreement ("EA Agreement"). [99] ¶ 19. Although, as the title implies, exclusive agents generally agree to sell Allstate products exclusively, Allstate allows these agents to sell products of certain third-party insurance carriers through Invantage, an Allstate affiliate. [99] ¶¶ 39–40. Through Invantage, third-party carriers provide non-competitive products to high-risk consumers who would otherwise not qualify for Allstate coverage. [99] ¶¶ 39–40. Exclusive agents require written approval and an effective EA Agreement to sell Invantage products. [99] ¶¶ 41–42. With the proper licensure, exclusive agents can also sell the products of Allstate Financial, which offers financial products and services. [99] ¶ 15. Such business is subject to FINRA regulations. [99] ¶ 15.

---

Several denials are impermissibly accompanied by lengthy argument, and others do not actually controvert the facts they purport to deny. Many denials are supported only by citation to Ziegler's affidavit, which in turn contains quite a few statements unsupported by personal knowledge. Defendants argue that Ziegler's affidavit is "self-serving." They are correct, but "[s]elf-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 459–60 (7th Cir. 2014). However, affidavits offered in summary judgment, self-serving or not, must nonetheless be based on personal knowledge to be admissible. *See* Fed. R. Civ. P. 56(c)(4). "Personal knowledge can include reasonable inferences, but it does not include speculating as to an employer's state of mind, or other intuitions, hunches, or rumors." *Widmar*, 772 F.3d at 460. I consider any facts not properly controverted by admissible evidence to be admitted. *See* LR 56.1. Finally, Ziegler did not submit any additional facts in the form required by Local Rule 56.1(b)(3)(C). Although Ziegler may refer to evidence to controvert an assertion by defendants, he may not rely on additional facts to support a denial of summary judgment because his failure to comply with the local rules did not give Allstate an opportunity to respond. Therefore, I disregard any additional evidence submitted by Ziegler, except when properly cited in Ziegler's Local Rule 56.1(b)(3) statement.

In 1999, Ziegler entered into an EA Agreement with Allstate and became an exclusive agent. [99] ¶ 30. Ziegler also had securities licenses that allowed him to sell financial products and services on behalf of Allstate Financial. [99] ¶ 38. He continued his work as an exclusive agent for the next 16 years or so, selling Allstate products out of his agency located at 1920 West 87th Street. [99] ¶ 35. Bill McGrath, the Regional Sales Leader for the Midwest Region, and Scott Olson, Territory Sales Leader, oversaw the region in which Ziegler's agency was located. [99] ¶ 36. Ziegler describes his tenure as an exclusive agent as "problem-free." [98] ¶ 19.

On September 1, 2015, the African American Agent Alliance, a group of African American Allstate exclusive agents, held a meeting. [99] ¶ 47. Ziegler was the president of the Alliance, and the meeting was held to discuss "racial issues." [98] ¶ 11. The amended complaint (verified by Ziegler's affidavit, [98] ¶ 5) alleged that the Alliance's meetings were a forum to discuss insurance rate disparities in African American zip codes. [66] ¶ 9. Another member of the Alliance told Ziegler that McGrath asked to attend the September 1 Alliance meeting. [98] ¶ 11. Ziegler did not want McGrath to attend. [98] ¶ 11. McGrath did not attend the meeting. [99] ¶ 48.

Also in September 2015, Allstate received a complaint from Dollie Perkins, a former employee at Ziegler's agency, stating that Ziegler had her do work that required licensure she did not have, and Allstate investigated the complaint. [99] ¶ 50.[2] On December 1, 2015, Ziegler received a letter terminating his EA

---

[2] Zeigler denies this statement, and he is competent to testify that Perkins never complained to him. [99] ¶ 50. But he does not have personal knowledge to deny that

Agreement, effective March 1, 2016. [99] ¶ 54. The letter stated that the termination was due to "reasons that include unauthorized use of agency staff." [91-8] at 2. The termination letter also noted that the EA Agreement was being terminated pursuant to Section XVII.B.2, [99] ¶ 54, which allowed for the agreement to be terminated by either party after providing 90 days prior written notice. [91-1] § XVII.B.2. Ziegler was reminded of his post-termination obligations under the EA Agreement, including to return Allstate-owned property as well as cease use and transfer ownership of Allstate telephone numbers. [91-8] at 2. The letter addressed the potential to receive a termination payment pursuant to the EA Agreement, "conditioned upon . . . compliance with the confidentiality and non-solicitation provisions [of the EA Agreement] . . . and the immediate return of all Allstate property." [91-8] at 2.

On December 18, 2015, Allstate Financial sent Ziegler a form that was to be submitted to FINRA to notify them of Ziegler's termination. [99] ¶ 58. The form listed the reason for termination as "[l]oss of affiliation with parent property and casualty insurance company after allegations of allowing unlicensed staff to conduct . . . insurance business requiring property and casualty licensure." [91-10] at 3. Ziegler then received a letter from Allstate on March 1, 2016, notifying him that the

---

Perkins complained to "anyone at Allstate," *see* [99] ¶ 50, and he offers no admissible evidence to controvert the investigator's statement that Perkins complained to Allstate Human Resources. He objects to hearsay contained within the Allstate investigator's report (the contents of interviews conducted by the investigator after receiving the complaint) and disputes the truth of Perkin's statements. Hearsay is inadmissible, but the fact of the complaint and its nature is admissible to explain Allstate's conduct. The evidence is admitted for that purpose. Ziegler does not dispute that an investigation occurred. [99] ¶ 52.

termination of his EA Agreement had taken effect and he no longer had authority to sell Allstate products. [99] ¶ 61. Along with that letter, Allstate enclosed copies of correspondence it sent to the Indiana and Illinois Departments of Insurance. [99] ¶ 61. Those letters notified the agencies of Ziegler's termination, explaining that "[t]he 'for cause' termination reason is due to unauthorized use of agency staff." [99] ¶ 62; [91-12] at 2–3.

On February 29, 2016, Allstate went to Ziegler's agency to collect its property. [99] ¶ 59. Ziegler declined to return his customer files or transfer his telephone numbers to Allstate, and he requested that Allstate leave the premises. [99] ¶ 60. As a result, Allstate petitioned this court for a preliminary injunction enjoining Ziegler from using, possessing, or having access to its confidential information and requiring him to transfer ownership of the telephone numbers he used for Allstate business. [99] ¶ 66; [25]. After holding an evidentiary hearing, at which Ziegler testified, I issued a preliminary injunction. [39]. Ziegler then returned Allstate's confidential information and transferred ownership of his business telephone number to Allstate. [99] ¶ 70. However, Ziegler never received a termination payment from Allstate. [99] ¶ 76.

## III.    Analysis

### A.    Employment Discrimination

Ziegler alleges two different types of claims under Title VII and 42 U.S.C. § 1981.[3] First, he argues that Allstate's handling of Ziegler's termination constituted discriminatory treatment based on his race. Second, he claims that defendants unlawfully terminated Ziegler's EA Agreement in retaliation either for refusing to allow McGrath to attend the Alliance meeting or for raising racial disparity issues at that meeting.[4] Allstate moves for summary judgment on the grounds that Ziegler has failed to corroborate his claims with evidentiary proof.

#### *1.    Discrimination*

The legal standard in employment discrimination cases is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Ziegler has not cited to any evidence that his race played a role in the termination of his EA Agreement. The Alliance discussed racial issues, but there is no connection between Ziegler's concern about McGrath attending an Alliance meeting and the termination of the EA Agreement. The only evidence Ziegler cites is an email in which McGrath asks, with respect to a meeting Olson had with Ziegler to inform him of the termination,

---

[3] The elements and methods of proof for Title VII and § 1981 are "identical" and do not require separate treatment. *See Smith v. Chicago Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015).

[4] Ziegler also makes a vague allegation that Allstate Financial may have also terminated him on the basis of discrimination. [98] ¶ 20. Ziegler offers no evidence to support the allegation or to explain how Allstate Financial may have discriminated against him.

"[h]ow'd it go?", defendants' admission that Olson reports to McGrath, and an email from Human Resources to McGrath informing him that Ziegler would be questioned about allegations of unlicensed staff. [100] at 17–18. These facts do not permit an inference that McGrath held any racial animus toward Ziegler and could not lead a reasonable person to conclude the termination was based on race.

Defendants have offered evidence of a legitimate reason for Ziegler's termination—that Allstate received a complaint about Ziegler using an unlicensed employee to do work that required a license. [99] ¶ 50. Ziegler has not offered any admissible evidence to suggest Allstate did not receive the complaint or that Allstate did not actually terminate him for that reason.[5] Ziegler argues that the investigation into unlicensed work was a pretext for discriminatory termination and disputes the accuracy of the investigation. [99] ¶ 50. But the evidence does not controvert the fact that Allstate received a complaint about a serious allegation that Ziegler was breaching the law, or that Allstate honestly believed (or reasonably relied on) their investigator. When evaluating pretext, "[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered for the adverse action." *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 570 (7th Cir. 2017) (citation omitted). Ziegler's evidence undermines the accuracy of the investigation, but not the honesty of Allstate's belief.

---

[5] *See* footnote 2, above.

Discrimination claims can be proven via the burden-shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), formerly referred to as the "indirect" method. *See Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017). To proceed on this approach, the plaintiff must first prove the four prima facie elements: "(1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he suffered an adverse employment action; and (4) one or more similarly situated individuals outside his protected class received better treatment." *Id.* at 500 (citation omitted).

Ziegler also fails to prove discrimination under this method. He has not identified a specific "similarly situated" individual, meaning "someone who is directly comparable to [him] in all material respects except for membership in the protected class." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012). Ziegler's reliance on general references to "white Agents" and "whites," [66] ¶¶ 25, 49, without any attempt to explain who these individuals are or how they are directly comparable to him, is insufficient to satisfy the element and establish a prima facie case.

## 2. *Retaliation*

For his retaliation claim, Ziegler "must produce enough evidence for a reasonable jury to conclude that (1) [he] engaged in a statutorily protected activity; (2) the defendants took a materially adverse action against [him]; and (3) there existed a but-for causal connection between the two." *Nicholson v. City of Peoria, Illinois*, 860 F.3d 520, 523 (7th Cir. 2017) (citation omitted). "Protected activity" is

"some step in opposition to a form of discrimination that the statute prohibits." *Ferrill*, 860 F.3d at 501 (citation omitted).

Ziegler has not clearly alleged what statutorily protected activity he engaged in, but it seems to be either that he refused to allow McGrath to attend the Alliance meeting or that he and the Alliance raised racial disparity issues at that meeting. [66] ¶ 12. To the extent Ziegler is arguing that defendants retaliated against him for refusing to allow McGrath to attend the Alliance meeting, the argument fails because declining to invite a superior to a meeting is not a statutorily protected activity. Nor is Ziegler's subjective fear that McGrath's presence would chill the discussion an act of opposing an unlawful practice. Even if it were, Ziegler has failed to provide any admissible proof that McGrath requested to attend the meeting. Instead, he relies on inadmissible hearsay statements in his affidavit that at most suggest that Ziegler believed McGrath wanted to attend. [98] ¶11. Other evidence in the record suggests that McGrath did not ask to attend. *See* [106-1] at 47:18–21, 48:8–16. If Ziegler's argument is that the retaliation was in response to his raising racial complaints at the meeting, he has not met his burden on that theory either. Ziegler states that the Alliance meeting was held to discuss "racial issues," [98] ¶ 11, but he has offered no evidence, including any statements in his affidavit, to prove he or the Alliance raised racial complaints at the meeting. Moreover, Ziegler must provide more detail than the vague statement of "racial issues" to show that his involvement in the meeting was sufficiently related to

opposition to discriminatory practices such that it qualified as a protected activity under the statute.[6]

Even assuming Ziegler was able to establish the protected activity element, he has not proven that he would not have been terminated but-for that activity. Ziegler has not pointed to any evidence in the record to suggest a link between his termination and any event surrounding the September 1 Alliance meeting. As discussed above, defendants offer a legitimate reason for his termination that Ziegler has failed to controvert.

Defendants' motion for summary judgment on Count I is granted.[7]

## B. Breach of Contract

The parties bring three claims alleging breaches of the EA Agreement. Allstate claims that Ziegler breached his post-termination obligations under the EA Agreement by withholding confidential Allstate information, failing to transfer his Allstate-owned phone numbers, and continuing to sell products that competed with those of Allstate. Ziegler claims that Allstate breached the EA Agreement by refusing to pay him termination payments owed to him under the agreement.

---

[6] Ziegler alleged that the Alliance was concerned with racial disparity in insurance rates, [66] ¶ 9, but he has not offered evidence that this concern was communicated to Allstate or that the Alliance was actively opposing an unlawful Allstate practice.

[7] Ziegler devotes a significant portion of his response brief on this claim to the "cat's paw" theory articulated in *Smith v. Bray*, 681 F.3d 888 (7th Cir. 2012), largely in the form of a copy-and-pasted portion of an article. The "cat's paw" theory, named in reference to the fable of a cat induced to action by an ill-intentioned monkey, is that an employer (the cat) may be held liable for adverse employment action taken on the recommendation of a subordinate with discriminatory animus (the monkey). *Id.* at 897. *Bray* expanded the theory, holding that the subordinate with retaliatory motive can be held liable for causing the employer to take adverse employment action. *Id.* at 899. Because Ziegler has not proven that either the cat or the monkey had any racial animus or retaliatory motive, the cat's paw theory is irrelevant.

In Illinois, a successful breach of contract claim requires a showing of "(1) the existence of a valid and enforceable contract; (2) substantial performance by the [plaintiff]; (3) a breach by defendants; and (4) resultant damages." *Dual-Temp Illinois, Inc. v. Hench Control, Inc.*, 821 F.3d 866, 869 (7th Cir. 2016). The parties do not dispute that the EA Agreement is a valid and enforceable contract.

### 1. Ziegler's Withholding of Confidential Information and His Business Telephone Number

In Counterclaim I, Allstate alleges that Ziegler breached the EA Agreement by failing to return Allstate confidential information and Allstate-owned telephone numbers after his termination.[8] Section XVIII.B states that "upon termination of this Agreement . . . [y]ou will immediately return all property belonging to the Company, or dispose of it in such manner as the Company specifies." [91-1] § XIII.B. The EA Agreement also provides that "confidential information is wholly owned by [Allstate]" and that "confidential information" includes "information regarding the names, addresses, and ages of policyholders or prospective policyholders of Allstate." [99] ¶ 22, 28; [91-1] § IV.D. Ziegler admits that he withheld files containing the names of Allstate policyholders after his termination. [91-2] at 106:12–22. However, he argues that the files he retained did not have contact information and were therefore "useless." [99] ¶ 68. Even so, being "useless" does

---

[8] Allstate also cites to Section IV.B of the EA Agreement as being breached. That provision prohibits Ziegler from disclosing confidential information to third parties or allowing third parties to have access to confidential information. [91-1] § IV.B. Defendants offer no evidence to prove third-party disclosure, so I deny summary judgment on this theory of breach.

not remove the information—the names of Allstate customers—from the definition of confidential information.

The EA Agreement also states that "upon termination of this Agreement . . . [y]ou will immediately cease to use such telephone numbers referenced in Section IX. above and [transfer] such numbers in your name to the Company." [91-1] § XVIII.C. Section IX provides that "[a]ll telephone numbers used in connection with business conducted pursuant to this Agreement are the property of [Allstate]." [99] ¶ 27; [91-1] § IX. Ziegler admitted that after his termination he retained the telephone number he used to do Allstate business. [91-3] at 36:1–12. Ziegler also admitted that he did not comply with Section XVIII.C. [91-3] at 37:5–7. The breach is established.

Ziegler's only argument in his defense is that he did not have to keep his obligations under the EA Agreement because Allstate did not discharge its obligations by not paying Ziegler the termination payment. But, as explained below, Allstate did not yet owe Ziegler the termination payment, which was expressly conditioned on Ziegler first returning the confidential information.[9] Ziegler provides no other argument for how Allstate failed to substantially perform under the contract.

---

[9] Ziegler makes a similar argument—that his performance under the contract was excused by Allstate's failure to pay the termination payment—in response to Allstate's Counterclaim II, and I reject it for the same reasons. Allstate's failure to pay was not a prior material breach because Allstate did not owe the termination payment.

## 2.      *Ziegler's Selling of Competitive Products*

Counterclaim II alleges that Ziegler continued to sell products that competed with Allstate's products after he was terminated, in violation of the EA Agreement's restrictive covenant. Ziegler claims that he only continued to sell competitive products that he had Allstate's approval to sell.

The EA Agreement states that "[f]or a period of one year following the termination, [Ziegler] will not solicit the purchase of products or services in competition with those sold by [Allstate] . . . [f]rom any office or business site located within one mile of any locations from which [Ziegler] solicited or sold [Allstate] insurance or other products." [99] ¶ 26; [91-1] § XVIII.D.3. At the preliminary injunction hearing, after Allstate terminated the EA Agreement, Ziegler testified that he continued to sell products that directly competed with Allstate products. [91-2] 112:25–113:2. He also testified that he sold those products out of his former Allstate agency location. *Id*. In his deposition, Ziegler admitted that he did not comply with Section XVII.D.3. [91-3] at 27:6–18. That establishes the breach. Ziegler argues that he had prior Allstate approval to sell those competitive products. To the extent he is referring to approval received through the Invantage program, the argument is not persuasive because, as he admitted, that approval was conditioned on the existence of a valid EA Agreement. [99] ¶¶ 41–42. Post-termination competition through Invantage customers was not approved.

## 3.      *Allstate's Withholding of the Termination Payment*

Ziegler alleges that Allstate breached the EA Agreement by failing to provide him with his termination payment. Defendants argue that the express terms of the

EA Agreement permitted Allstate to withhold the termination payment due to Ziegler's failure to comply with his post-termination contractual obligations.

The specific contractual provision Ziegler points to is Section XIX.F, which he quotes as stating that "[termination] (payments) will be made in 12 monthly installments." [66] ¶ 27. What Ziegler omits from his excerpt is the remainder of the provision, which states: "[Termination payments] will be made in 12 monthly installments . . . beginning no later than the end of the month after the month in which all property, confidential information, and trade secrets belonging to the Company have been returned or made available for return . . . or have been disposed of." [91-1] § XIX.F. Ziegler admits that exclusive agents can only receive termination payments if they comply with the confidentiality provisions of the EA Agreement. [99] ¶ 75. As discussed above, Ziegler also admitted that he did not immediately return Allstate's property or confidential information after the termination. Therefore, he was not entitled to receive the termination payment.

Ziegler also argues that he eventually did comply with the post-termination requirements to return the confidential information and transfer ownership of the telephone number, but Allstate still refused to make the termination payment. Section XIX.G of the EA Agreement states: "In the event that you breach or violate any of the provisions of Section IV. or Section XVIII. above, the Company shall be entitled to withhold remaining monthly installments, if any, and to receive from you liquidated damages in an amount equal to 100 percent of the total amount already paid to you in monthly installments." [91-1] § XIX.G. Because Ziegler, as

established above, breached several provisions of Section XVIII, the express terms of the contract allowed Allstate to withhold termination payments. Therefore, Allstate did not breach the EA Agreement by doing so.

Defendants' motion for summary judgment on Count II is granted. Defendant's motion for summary judgment on Counterclaim I and Counterclaim II is granted with respect to liability for the breaches of contract. The issue of damages for these claims is unresolved and will be determined in further proceedings.

### C. Tortious Interference with Contract

To succeed on a tortious interference with contract claim in Illinois, a plaintiff must show: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 154–55 (1989)). Allstate argues that Ziegler has failed to put forth evidence that any alleged interference by defendants was "intentional and unjustified."

First, Ziegler alleges that Allstate's termination of his employment interfered with his independence—his ability to run his business pursuant to the EA Agreement. However, "[i]t is settled law that a party cannot tortiously interfere with his own contract; the tortfeasor must be a third party to the contractual

relationship." *Nation v. Am. Capital, Ltd.*, 682 F.3d 648, 652 (7th Cir. 2012) (quoting *Douglas Theater Corp. v. Chi. Title & Trust Co.*, 288 Ill.App.3d 880, 884 (Ill. App. Ct. 1997)). There is no dispute that Allstate is a party to the EA Agreement, [99] ¶ 32, and therefore Allstate cannot interfere with its own contract.

Second, Ziegler claims that Allstate interfered with his business by notifying third-parties of his termination. For example, Ziegler claims that Allstate contacted Northeast Agencies, Inc. and caused it to terminate a contract between Ziegler and Northeast. But to sustain a claim of tortious interference with contract, Ziegler must show that Allstate induced a *breach* of the contract, not a proper and lawful termination. *See Bank Fin., FSB v. Brandwein*, 36 N.E.3d 421, 431 (Ill. Ct. App. 2015) ("[T]here was no breach of contract, no cognizable harm, and thus no tortious interference."). There is no evidence that Northeast breached its contract with Ziegler (or even that a valid contract existed between Northeast and Ziegler). Nor has Ziegler provided evidence that the remainder of his tortious interference claims—for the transfer of Ziegler's clients to another agency, the termination of Microsoft Office software, and a letter to agency customers about the new agency—involved the breach of a valid contract. Even if Ziegler had proven breaches of the third party contracts, Ziegler has not offered proof that Allstate intended to induce any of the breaches or was unjustified in doing so.

Defendants' motion for summary judgment on Count III is granted.

### D.    Conversion

In the amended complaint, Ziegler claims that Allstate wrongfully converted his Allstate Financial files, sign casings, and funds from his Citibank credit card. Defendants argued in favor of summary judgment on the conversion claim, but Ziegler declined to address the conversion claim at all in his opposition brief. He abandoned the claim. *See Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th Cir. 2003) (stating that failure to address claim in opposition brief to summary judgment motion deems it abandoned).

Even if Ziegler had not abandoned his conversion claim, it would not have survived summary judgment because he failed to allege he had a right to the property he claimed Allstate wrongfully converted. *See Toll Processing Servs., LLC v. Kastalon, Inc.*, No. 15-3187, 2018 WL 505338, at *3 (7th Cir. Jan. 23, 2018) (listing "plaintiff's right in the property" as an element of an Illinois conversion claim (quoting *Gen. Motors Corp. v. Douglass*, 206 Ill.App.3d 881, 886 (1990))).

Defendants' motion for summary judgment on Count IV is granted.

### E.    Defamation Per Se

Ziegler also asserts that several statements made by Allstate to third parties were defamatory, including a statement to a client that errors were made in their insurance policy, statements to the Illinois and Indiana Departments of Insurance that Ziegler was terminated "for cause," and the reason for termination given to FINRA. Defendants respond that these statements are true, and therefore not

defamatory. They also argue that Ziegler has not shown any proof of damages caused by the allegedly defamatory statements.

Although proof of damages is a requirement for defamation per quad, defamation per se involves "defamatory statements [ ] so serious that reputational injury may be presumed" and therefore does not require proof of damages. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 698 (7th Cir. 2006). Illinois recognizes five different categories of defamation per se, two of which are potentially relevant here: "(1) statements that suggest that the subject can't perform his job because of lack of ability or want of integrity, and (2) statements that prejudice the subject in the pursuit of his trade or profession." *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 613 (7th Cir. 2013). However, statements that are "substantially true" are not actionable as defamatory. *Coghlan v. Beck*, 984 N.E.2d 132, 146 (Ill. Ct. App. 2013). The issue of truth is typically reserved for the jury, but "the question is one of law where no reasonable jury could find that substantial truth had not been established." *Id.* (citations omitted).

The first allegedly defamatory statement is based on a line in a letter from a client to Ziegler: "We were also informed that as an agent there were some things that were done incorrectly." [66-2] at 20. According to the amended complaint, Ziegler apparently believes this line to indicate Allstate told the client that "Ziegler made errors to their insurance policy." [66] ¶ 42. However, Ziegler provides no proof that Allstate actually made that statement or any proof of its falsity.

Next, Ziegler alleges that Allstate's statements to the Illinois and Indiana Departments of Insurances relating that Ziegler was terminated "for cause" were defamatory. They were not, because they were true. When Allstate terminated Ziegler's contract, it invoked Section XVII.B.2, not the for-cause provision of Section XVII.B.3. But this does not mean that Ziegler was not terminated for cause. The contractual provision bears on the parties' rights and obligations under the agreement, but it does not limit Allstate's justification for the termination. Allstate told Ziegler that the reason for his termination was the unauthorized use of agency staff—this was a for-cause reason. [91-8] at 2. As discussed earlier with respect to pretext and discrimination, even if Allstate's belief was incorrect, Ziegler has not proven that Allstate was lying when it said unauthorized use of staff was its reason to terminate him.

The third and final allegedly defamatory statement is Allstate's statement to FINRA that the cause of Ziegler's Allstate Financial termination was "[l]oss of affiliation with parent property and casualty insurance company after allegations of allowing unlicensed staff to conduct property and casualty insurance business requiring property and casualty licensure." [91-10] at 3. Importantly, Allstate describes the use of unlicensed staff as an allegation, not a fact. As discussed above, the fact that Allstate received an allegation that Ziegler impermissibly used unlicensed staff is not in dispute. He was then terminated from Allstate, the parent company. Therefore, the truth of Allstate's statement is undisputed.

Defendants' motion for summary judgment on Count V is granted.

**F.       Violation of the Fair Credit Reporting Act**

Ziegler claims Allstate violated the Fair Credit Reporting Act, 15 U.S.C § 1681 *et seq.*, by disclosing Ziegler's termination to third parties and denying him the opportunity to refute the allegations against him. The only specific FCRA provision that Ziegler points to is § 1681a(d)(2)(A)(iii), which is an exclusion in a definition provision and not an actionable statutory mandate. In any event, defendants argue that Ziegler does not qualify for the protections of the FCRA because the information regarding Ziegler's termination does not meet the statutory definition of a "consumer report." They are correct.

The FCRA provides various protections for consumers in their dealings with consumer reporting agencies, including, for example, protection against adverse employment actions taken on the basis of "consumer reports" without disclosure. *See* § 1681a(y). But the information regarding Ziegler's termination does not qualify as a "consumer report." The statute defines a "consumer report" as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected . . . for the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes." § 1681a(d)(1). A "consumer reporting agency" is defined as "any person which . . . regularly engages . . . in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports

to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." § 1681a(f).

Ziegler has not provided any evidence to suggest Allstate "regularly" assembles or evaluates information on consumers for third parties. Even if Allstate did qualify as a "consumer reporting agency," information regarding Ziegler's termination would still not meet the definition of a consumer report because "report[s] containing information solely as to transactions or experiences between the consumer and the person making the report" are exempted. § 1681a(d)(2)(A)(i). Ziegler has not alleged or offered evidence to show that the alleged "reports" about Ziegler's termination concerned anything other than the relationship between Allstate and Ziegler, as its exclusive agent. Therefore, the FCRA does not apply to Allstate's disclosures or handling of Ziegler's termination, and his claim fails.

Defendants' motion for summary judgment on Count VI is granted.

## G.    Misappropriation of Trade Secrets

Finally, Counterclaim III alleges that Ziegler misappropriated Allstate's trade secrets, including Allstate business plans, personal information of Allstate policyholders, and Allstate policy information. More specifically, Allstate claims that Ziegler's refusal to return this confidential information to Allstate constitutes a "threatened" misappropriation of confidential information.

To establish a misappropriation claim under the Illinois Trade Secrets Act, a claimant must show "(1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade

secret was damaged by the misappropriation." *Destiny Health, Inc. v. Connecticut Gen. Life Ins. Co.*, 39 N.E.3d 275, 282 (Ill. App. Ct. 2015) (citation omitted). Allstate has not provided any evidence that Ziegler improperly acquired, disclosed, or used the alleged trade secrets. Allstate claims that Ziegler "kept and used Allstate trade secret information to target potential customers for his competitive business," but its citations to the record do not support its factual assertion. [99] ¶ 69. Additionally, Allstate argues that Ziegler's refusal to return confidential information constitutes "threatened" misuse, [51] ¶ 110–12, but the argument is tenuous at best, and, nonetheless, Ziegler has already returned the confidential information. [99] at 70.

Defendants' motion for summary judgment on Counterclaim III is denied.

## IV. Conclusion

Defendants' motion for summary judgment [89] is granted in part, denied in part.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: March 7, 2018